**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

CAROL HULTS and                  :
JENNY REDONDO,
                                 :
      **Plaintiffs**
                                 :     CIVIL ACTION NO. 4:06-0541
         v.
                                 :         (MANNION, J.)
ALLSTATE SEPTIC SYSTEMS,
LLP,                             :

      **Defendant**              :

## M E M O R A N D U M

Pending before the court is the defendant's motion for summary judgment.

(Doc. No. 29).  Based upon a review of the record in this case, the defendant's

motion will be granted.


## I.    PROCEDURAL BACKGROUND

On March 14, 2006, the plaintiffs brought the instant action against

Allstate Septic Systems, LLP, ("Allstate"), and the matter was assigned to the

Honorable Malcolm Muir. [1] (Doc. No. 1).  On June 19, 2006, Allstate filed an

answer to the plaintiffs' complaint.  (Doc. No. 8).  On July 25, 2006, the parties

consented to the jurisdiction of the undersigned pursuant to 28 U.S.C.

§636(c)(1) and the matter was reassigned.

On May 30, 2007, the defendant filed the instant motion for summary

---

[1]A third party action had been filed against Anthony Cuifo, however, by memorandum and order dated April 18, 2007, (Doc. No. 28), and by subsequent stipulation of the parties, (Doc. No. 47), Mr. Ciufo is no longer a party to these proceedings.

judgment with exhibits, (Doc. No. 29), as well as a statement of material facts, (Doc. No. 30), and a supporting brief, (Doc. No. 31).  After having been granted an extension of time, (Doc. No. 35), on June 19, 2007, the plaintiffs filed an answer to the defendant's statement of material facts, (Doc. No. 36), as well as their own statement of facts, (Doc. No. 37), and an opposing brief, (Doc. No. 38).  The defendant filed a reply brief on June 25, 2007.  (Doc. No. 39).  On June 27, 2007, the plaintiffs filed a sur-reply brief[2].  (Doc. No. 40).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving

---

[2]Pursuant to L.R. 7.7, the plaintiffs should have sought leave of court prior to filing their sur-reply, despite failing to do so, the court has considered the arguments contained therein.

> party has failed to make a sufficient showing on an
> essential element of her case with respect to which
> she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Id.

## III.   DISCUSSION

In their complaint, the plaintiffs allege that they entered into an agreement

3

dated October 26, 2003, to purchase real estate known as the Liberty Annex located on Route 940, Pocono Lakes, Pennsylvania, consisting of six apartments and two rental units, ("Liberty Annex"), for a consideration of $635,500.00. Pursuant to the agreement, the plaintiffs allege that they had the property inspected by Keystone Inspection Service, Sciota, Pennsylvania, which informed them that the septic system had failed the inspection.

According to the plaintiffs, the owner of the property agreed to fix the septic system. They allege that the owner contracted with Allstate, and told Allstate that he was willing to do whatever it would take to make the septic system work, even if a new system was needed.

The plaintiffs allege that Allstate inspected the property and represented and agreed that it could and would correct the septic system at a cost of $8,562.22. The plaintiffs allege that they contracted with Allstate to fix the septic system. However, because of the weather and the scheduling of the closing, the plaintiffs allege that it was agreed that the septic system would be repaired after the closing and that the amount of $8,562.22 would be withheld from the purchase price to pay Allstate.

According to the plaintiffs, Allstate carried out the work agreed to in its contract of April 13, 2004, and was paid $8,562.22. However, the plaintiffs allege that the septic system continued to malfunction and Allstate was called back several times to repair the septic system. Ultimately, the plaintiffs allege that Allstate informed them that the system was not large enough to support the use of six apartments and two retail spaces, in fact it was 1/6 the size that it

4

should be.

The plaintiffs allege that the soil on their property has severe limitations for on-lot sewage disposal, and that the property will only support a system with a sewage flow of 600 gallons per day, whereas the existing use of the property has a sewage flow in excess of 2,600 gallons per day.  As such, the plaintiffs allege that their use of the property is severely restricted because of its inability to support a larger on-lot sewage disposal system, thereby diminishing the value of the property.

The plaintiffs allege that the fair market value of their property has been substantially reduced because of its inability to support a larger on-lot sewage disposal system and because of its inability to support a sewage disposal system sufficient to serve the use of the property consisting of six apartments and two retail spaces.

As a result of the foregoing, the plaintiffs brought the instant action against the defendant raising claims of professional negligence (Count I) and negligent misrepresentation (Count II).

With respect to their professional negligence claim, the plaintiffs allege that Allstate held itself out as being knowledgeable and professional in septic system design, septic system inspection, septic system repair, soil probe and percolation testing.  As a professional in septic system design, installation, inspection, repair, soil probe and percolation testing, the plaintiffs allege that Allstate owed the public and them, in particular, a duty of diligence and good faith.  However, the plaintiffs allege that Allstate failed to act with the proper

5

customary skill and care generally used by those engaged in the profession or trade, of providing services for septic system design, installation, inspection, soil probe and percolation testing.  In addition, they allege that Allstate failed to exercise the care that a reasonably prudent business man in its field would exercise under the circumstances. According to the plaintiffs' complaint, Allstate's failure to perform the duties which it owed to them resulted in a substantial loss to them.

With respect to their negligent misrepresentation claim, the plaintiffs allege that Allstate represented to them that it could and would repair the septic system on the property that they were purchasing and that it would make the septic system work. According to the plaintiffs, Allstate ought to have known that its representation was false. However, the plaintiffs allege that Allstate failed to make a reasonable investigation of the truth of its representation and it was made with the intent to induce the plaintiffs to act on it. The plaintiffs allege that Allstate's misrepresentation resulted in injury to them, as they acted in justifiable reliance on Allstate's representation. As a result of Allstate's negligent misrepresentation, the plaintiffs allege that they have sustained a substantial loss.

In an attempt to pierce the allegations of the plaintiffs' complaint and establish that there is no genuine issue of fact for trial, the defendant has submitted a statement of material facts.  Considering the defendant's statement of facts and the plaintiffs' response thereto, the following facts are not in dispute:

Allstate is a Pennsylvania limited liability partnership doing business in

Bangor, Pennsylvania. Allstate Septic Systems, LLP, does not hold any professional licenses from the Commonwealth of Pennsylvania or any other state.

At all times relevant to the instant action and through May of 2004, Anthony Ciufo, ("Ciufo"), resided in an apartment at the property known as Liberty Annex.  Prior to July of 1998, Ciufo purchased the Liberty Annex property.  In 1998, Ciufo, working with and through his engineers, Achterman Associates, submitted a Site Improvement Plan to Tobyhanna Township for the property, which plan was ultimately approved by the Township on July 20, 1998.

As part of the planning process, Ciufo asked the Sewage Enforcement Officer of Tobyhanna Township to do a soils test on the property.  The test failed and Ciufo was made aware that an additional septic system or an expansion of the existing septic system could not occur and the site could not support increased sewage flows. In reviewing Ciufo's Site Improvement Plan, the engineers for Tobyhanna Township, Bue-Morris Associates, Inc., wrote a letter dated March 18, 1998, which stated:

> 8.     Because the proposed use will increase the wastewater flow, a letter must be provided by the Township's Sewage Enforcement Officer (SEO) that the existing sand mound can treat the additional capacity . . . In addition, BMA is concerned that there will be no location on the property to site a replacement sand mound when it is required . . .

In response, Ciufo's engineers, Achterman Associates, in a letter dated April 13, 1998, represented that:

8.     It is not anticipated that sewage flows will increase with the future use. In the past, the property was occupied by 2 residential apartments, a retail store, a furniture store and an office. Based on the previous PADEP sewage flow requirements, there was a potential for 615 GPD [gallons per day] of sewage effluent on this site. . . One apartment is being eliminated and replaced with office space.  Using current PADEP flows, today's equivalent flow would allow for approximately 21 employees to be employed within the entire building . . . Based on the anticipated usage, this number should not be exceeded.

The notes created by Ciufo's engineers on the approved plan state:

9.     Prior Use:  2 residential apartments
                    1 retail storage
                    1 furniture store
                    1 office

10.    Proposed Use:    1 residential apartment
                        Retail and office space
                        Storage in support of tenants'
                        use
                        Estimated Employees - 20

After May of 2002, Ciufo converted retail and office space in the building to five additional residential apartments and did not seek approval for this change from Tobyhanna Township, nor did he seek to modify the 1977 septic permit which ran with the property. Ciufo understood that there was a connection between flows from the building and the sand mound.

On October 26, 2003, the plaintiffs entered into an Agreement of Sale with Ciufo to purchase the property.  Neither of the plaintiffs had any experience in commercial or investment real estate or with septic systems.  The plaintiffs were represented by Attorney Timothy Fisher in this transaction.  The plaintiffs hired

8

Keystone Inspection Services, Inc., to inspect the property and were informed that the septic system had failed the inspection. Ciufo knew at the time that he sold the property to the plaintiffs that there was no other suitable site on the property for a septic system. Ciufo contacted Allstate to repair the septic system.

Allstate was never given the first page of the Keystone Inspection Report, which indicated the number of apartments in the building, and was only provided with the septic system failure report from Keystone[3]. Allstate met with Ciufo on January 14 and January 16, 2004, at the septic mound on the property. The plaintiffs were not present when Ciufo met with Allstate on these two occasions[4].

Allstate took a sand sample from the septic mound which sample failed

---

[3]Although the plaintiffs deny this statement, their only response is that Allstate knew that there were apartments on the property. Allstate's statement does not indicate that they did not know that there were apartments on the property, but only that they did not receive the first page of Keystone's report, which indicated the number of apartments.

The court further notes that, in support of their denial, the plaintiffs cite to several pages of transcripts which have not been included as part of the record. Specifically, the Fox deposition, p. 22, and the Garis deposition, pp. 23-24.

[4]The plaintiffs deny this statement indicating that plaintiff Hults met with Dennis Fox of Allstate and Ciufo on the property prior to closing. Again, this statement does not indicate that Allstate did not meet with the plaintiffs prior to closing, it indicates that they did not meet with the plaintiffs on January 14 or January 16, 2004. In fact, in the pages of plaintiff Hults' deposition cited to by the plaintiffs denying this statement, plaintiff Hults specifically admits to not being present on January 14, 2004, date and indicates that she believes they met sometime in February. The deposition testimony of Dennis Fox of Allstate referenced by the plaintiff in denying this statement indicates that he met with Ciufo and plaintiff Hults at the contract signing, which occurred on April 29, 2004.

the laboratory testing indicating that the sand was not acceptable under the standards of the Department of Environmental Protection.  Allstate was given the permitted septic design from Ciufo, who had obtained it from Tobyhanna Township.  The septic design was permitted in 1977.  Ciufo knew that there was only one system design from 1977 on file with Tobyhanna Township that Allstate was going to repair.

Allstate gave Ciufo a proposal dated February 10, 2004, to repair the septic for a cost of $8,560.22[5]/[6].  The proposal provided that the defendant would rebuild the existing sand mound "as specified in the original septic system design provided by the customer, and will be subject to the approval of the Tobyhanna Township Sewage Enforcement Officer.[7]"  The proposal further contained language which exempted responsibility by Allstate for any "flows from the dwelling exceeding the design flow of the system.[8]"  Until the instant action was filed, Allstate had no information regarding the terms of the Agreement of

---

[5]Allstate cites to paragraph 7 of the plaintiff's complaint in support of this statement.  To this extent, the plaintiff denies the statement.  However, the record clearly contains a proposal dated February 10, 2004, in which Allstate indicates that it would repair the system for a cost of $8,560.22.  (Doc. No. 29, Ex. E).

[6]The court notes that the defendant apparently mistakenly indicated that the proposal was for the amount of $8,562.22.  It is clear from the record that the actual amount proposed was $8,560.22.

[7]Although the plaintiffs deny this statement, the proposal speaks for itself.

[8]See n.7.

10

Sale between Ciufo and the plaintiffs[9]. The plaintiff's had reviewed the proposal dated February 10, 2004, before they signed an Addendum to the Agreement of Sale regarding repairs to the septic system[10].

The Addendum between the plaintiffs and Ciufo regarding the repairs to the septic system was executed at the time of the real estate closing on the property on April 27, 2004. This Addendum provides:

> Seller will pay Buyer $8,560.22 for septic repairs pursuant to the February 10, 2004 job proposal from Allstate Septic Systems. By the payment of these monies the Seller is hereby relieved of any and all further responsibility concerning the septic system and any and all repairs.

The Addendum further provides that the $8,560.22 was "paid in full on April 27, 2004" from Ciufo to the plaintiffs, the date on which they closed on the property.

---

[9]Plaintiffs deny this statement indicating that Allstate knew that Ciufo was selling the property. In fact, a consultation document dated January 16, 2004, demonstrates that Allstate knew that Ciufo was selling the property. (Doc. No. 1, Attachment). However, there is no indication from the record that Allstate was given the terms of the Agreement of Sale between Ciufo and the plaintiffs.

[10]Citing to the deposition transcript page relied on by the defendant in making this statement, the plaintiffs deny the statement indicating that Ms. Hults did not indicate when she saw the proposal. (Hults Deposition Transcript, p. 78). However, four pages later, the following exchange occurred:

> Q.    You had seen the proposal that ultimately formed the basis of the contract at least as early as the addendum, which is February 27, 2004?
>
> A.    Yes.

(Hults Deposition Transcript, p. 82).

The plaintiffs never looked up the credentials of Allstate, including on the internet; never asked them for their credentials; and were never offered credentials by Allstate.  Ciufo brought Allstate into the transaction and told the plaintiffs that he already had someone to fix the septic.

The contract signed by plaintiff Hults with Allstate has the following terms which are nearly identical to the Proposal agreed upon by the plaintiffs and Ciufo on April 27, 2004:

> a.   Installation "as specified in the original septic system design provided by the homeowner"
> b.   Exemption of "flows from the dwelling exceeding the design flow of the system".

The plaintiffs did not, at any time, ask anyone about the original septic system design which was referenced in both the Proposal and the Contract from Allstate.

On March 24, 2006, the plaintiffs, prior to the initiation of the instant action, instituted litigation against Ciufo which remains pending in the Court of Common Pleas of Monroe County, Pennsylvania, at Docket Number 8952-CV-2005.

The plaintiffs never asked Keystone Inspection Service to review Allstate's proposed scope of work.

In October of 2004, Allstate carried out the work agreed to in its contract of April 13, 2004, and was paid $8,560.22.  Subsequently, Allstate was called back several times to repair the septic system.  Ultimately, Allstate informed the plaintiffs that the system was not large enough to support the use of six apartments and two retail spaces for which it was being used.

12

Based upon the undisputed facts, the defendant argues that it is entitled to summary judgment on the plaintiffs' claims.  With respect to the plaintiffs' professional negligence claim[11], Allstate argues that it is an unlicensed service provider, which is unamenable to suit under the Restatement (Second) of Torts §299A.

The plaintiffs have brought Count I of their complaint pursuant to Section 299A of the Restatement (Second) of Torts which reads as follows:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

Citing to Rule 1042.1 of the Pennsylvania Rules of Civil Procedure, the defendant argues that Pennsylvania only recognizes professional liability claims against traditionally recognized and specifically enumerated licensed professionals such as health care providers, accountants, architects, chiropractors, dentists, engineers, nurses, optometrists, pharmacists, and attorneys. Allstate argues that no Pennsylvania law exists to extend professional negligence claims under §299A to unlicensed individuals.

Upon review, the scope of Pa.R.C.P. 1042.1 provides that "[t]he rules of this chapter govern a civil action in which a professional liability claim is asserted

---

[11] The defendant addressed the two counts of the plaintiffs' complaint in reverse order.  Because the court finds that the arguments raised by the defendant with respect to Count I are dispositive, the court will address the arguments raised with respect to that claim first.

13

against a licensed professional." It does not provide that a professional negligence claim cannot be maintained against an individual not enumerated in that Rule, but only that the Rule will be applied in those cases where a professional liability claim is asserted against one of the licensed professionals listed.

Moreover, in reviewing §299A of the Restatement (Second) of Torts, the comments provide:

> b. Profession or trade. This Section is thus a special application of the rule stated in § 299. It applies to any person who undertakes to render services to another in the practice of a profession, such as that of physician or surgeon, dentist, pharmacist, oculist, attorney, accountant, or engineer. It applies also to any person who undertakes to render services to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber. This Section states the minimum skill and knowledge which the actor undertakes to exercise, and therefore to have. If he has in fact greater skill than that common to the profession or trade, he is required to exercise that skill, as stated in § 299, Comment e.

The court notes that the list of "professions" contained in §299A are the same as those enumerated in Pa.R.C.P. 1042.1. However, §299A also applies to certain "skilled trades," which are noted to include airplane pilots, precision machinists, electricians, carpenters, blacksmiths, and plumbers. With the exception of airplane pilots, who are regulated and licensed under federal law, the remaining "skilled trades" are not required to be licensed under Pennsylvania state law. See Purdon's Pennsylvania Statutes and Consolidated Statutes Annotated, Title 63, Professions and Occupations (State Licensed).

14

In fact, the requirements of each of the skilled trades are regulated by municipal law, which may or may not require licensing.  Therefore, the court finds that it is not necessary that Allstate be licensed in order to be subject to a claim based upon §299A.  Section §299A simply provides the standard duty of care applicable in a business setting.

In the alternative, Allstate argues that the plaintiffs' negligence claim would be barred by the economic loss doctrine because the plaintiffs' damages are solely economic and they have alleged neither physical injury nor property damages outside of the contractual relationship with the defendant.

In response, the plaintiffs do not dispute that they are seeking to recover only economic losses.  To this extent, the plaintiffs indicate that they are seeking damages in the amount of the reduced value of the real estate caused by the septic system that is not sufficiently large to accommodate the commercial property which they understood that they were purchasing from Ciufo. Tragically, they further allege that they put their life savings into buying the property and are working two jobs to keep up the payments on the debt they incurred to raise the down payment.  In addition, the plaintiffs claim that they have already defaulted on the mortgage on the Liberty Annex property which they have been unable to sell at a fraction of the price they paid for it because of the septic system situation.

The plaintiffs rely, however, on the origin of the economic loss doctrine to argue that it is not applicable to their case.  Specifically, the plaintiffs argue that the genesis of the doctrine was in dealing with breach of warranty under the

15

Uniform Commercial Code, ("UCC"), and strict liability under Section 402A of the Restatement of Torts.   In distinguishing those causes of action, the plaintiffs indicate that the courts articulated the rule that if your claim was only for economic loss it ought to be brought under the breach of warranty provisions of the UCC and if your claim was one for personal injuries, it ought to be brought as a cause of action pursuant to Section 402A of the Restatement of Torts. Citing to Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604 (3d Cir. 1995), the plaintiffs argue that the economic loss doctrine covers only those situations in which "a party in privity of contract with another suffers an injury to a product itself resulting in purely economic loss."  The plaintiffs argue that this case is not about injury to a product or about an injury caused by a product, but is about the misrepresentations of the defendant.

Despite the plaintiffs' argument, the economic loss doctrine has been extended outside of the products liability realm to cases involving negligence in the performance of services contracts.  See Nufeeds, Inc. v. Westmin Corp., 2006 WL 1000021 (M.D.Pa. April 17, 2006)(quoting Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 272 F.Supp.2d 482 (E.D.Pa. 2003)(citing Ashburner Concrete and Masonary Supply, Inc. v. O'Connor Truck Sales, Inc., 2001 WL 1808035 *3 (Pa.Cm.Pl. Aug. 10, 2001)(citing Hartford Fire Ins. Co. v. Associated Constr. and Management Corp., 2000 WL 424273 *7 (E.D.Pa. Apr. 19, 2000)(holding that economic loss doctrine bars negligence claims as to engineering services related to roof repair and reconstruction); Factory Market, Inc. v. Schuller Int'l Inc., 987 F.Supp. 387, 397 (E.D.Pa.

16

1997)(same); Sun Co., Inc. v. Badger Design & Constructors, Inc., 939 F.Supp. 365, 370 (E.D.Pa. 1996)(economic loss doctrine applied to losses from breach of engineering services contract)).   See also Benevento v. Life USA Holding, Inc., 61 F.Supp.2d 407 (E.D.Pa.1999); Factory Market, Inc. v. Schuller Intern., Inc., 987 F.Supp. 387 (E.D.Pa.1997).

Further, in relation to the defendant's argument, in Aikens v. Baltimore & Ohio RR. Co., 501 A.2d 277, 278 (1985), the Pennsylvania Superior Court held that workers who lost wages because a train derailment damaged the factory where they worked could not bring a negligence claim for their "purely economic loss[es]," unless there was also physical injury, either to the person or property. Aikens's economic loss rule has been extended to other cases to bar negligence claims seeking recovery for "economic damages" or "losses" unless there has also been physical injury either to a person or property.   See Spivack v. Berks Ridge Corp., 586 A.2d 402, 405 (Pa.Super. 1990); Adams v. Copper Beach Townhome Communities, L.P., 816 A.2d 301, 305 (Pa.Super. 2003)("The Economic Loss Doctrine provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage.").

Relying on Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 1270 (Pa. 2005), the first case in which the Pennsylvania Supreme Court addressed the application of the economic loss doctrine, the plaintiffs argue that the economic loss doctrine would not bar recovery of economic damages in their case, even without a claim of personal injury or property damages.

17

In Bilt-Rite, a school district entered into a contract with an architect, whereby the architect prepared drawings for the construction of a new school. On the basis of these drawings, the school district solicited bids from contractors for the construction of the school.  Bilt-Rite submitted the winning bid, and its subsequent contract with the school board specifically referred to the architect's drawings.  Bilt-Rite and the architect never entered into a contract.  Based on errors in the architect's plans, Bilt-Rite was forced to substantially increase its construction costs, and Bilt-Rite sued the architect for negligent misrepresentation.  The architect filed a demurrer, arguing that Bilt-Rite's action was barred by the economic loss doctrine and that Bilt-Rite could not recover because Bilt-Rite and the architect were not in contractual privity.  The trial court sustained the demurrer and dismissed the complaint; the superior court affirmed. The Pennsylvania Supreme Court reversed, holding that the architect could be liable to Bilt-Rite for negligent misrepresentation, in spite of their lack of contractual privity and the traditional bar against recovery in tort for economic losses.

In considering the matter, the court adopted the Restatement (Second) of Torts §552 (1977) as applied to professionals like architects and design professionals, who are in the business of supplying information for use by third parties, thus allowing the plaintiff construction company to sue for the architect's negligent misrepresentation which increased the plaintiff's costs of constructing a school.  In doing so, the court rejected the use of the economic loss doctrine to bar the negligent misrepresentation claim.  However, in so holding, the court

18

stated as follows:

> Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

Bilt-Rite, 866 A.2d at 287.

The court recognized that, although "design professional services play an important role in public and private planning," design professionals should not be excused from tort consequences in their work "given the important reliance placed upon such professional services." Id. In addition, the court found that the application of §552 in Pennsylvania would not be unduly burdensome upon design professionals, as it "merely subjects them to the same sort of professional responsibility other professionals face" and "serve[s] the overall public interest by discouraging negligence among design professionals." Id.

Most courts considering the issue have specifically restricted the holding of Bilt-Rite to negligent misrepresentation claims. See Pennsylvania State Employees Credit Union v. Fifth Third Bank, 398 F.Supp.2d 317, 327 (M.D.Pa. Oct. 18, 2005); Sovereign Bank v. BJ's Wholesale Club, Inc., 395 F.Supp.2d 183, 193 (M.D.Pa. Oct. 18, 2005); Nufeeds, Inc. v. Westmin Corp., 2006 WL 1000021, *7 (M.D.Pa. Apr. 17, 2006); Samuel Grossi and Sons, Inc. v. U.S.

19

Fidelity and Guar. Co., 2005 WL 1522043, *6 (Pa.Com.Pl. Jun. 27, 2005).  But See, McElwee Group, LLC v. Municipal Authority of Borough of Elverson, 476 F.Supp.2d 472, 476 (E.D.Pa. Mar. 06, 2007)(expanding Bilt-Rite to apply to an intentional misrepresentation claim).

Some courts have read Bilt-Rite to have an even more narrow application to only those negligent misrepresentation claims involving architects and similar design professionals.  See Rock v. Voshell, 2005 WL 3557841, *1 (E.D.Pa. Dec 29, 2005); Carson/DePaul/Ramos v. Driscoll/Hunt, 2006 WL 2009047, *9 (Pa.Com.Pl. Jun 29, 2006).

Although the court sympathizes with the plaintiffs' unfortunate situation, it agrees that the holding in Bilt-Rite does not appear to have been intended to extended beyond the parameters set forth by the Pennsylvania Supreme Court, namely to negligent misrepresentation cases involving those individuals who are in the business of providing information for use by third parties, such as architects and design professionals.  Therefore, the court finds that Bilt-Rite would not operate to restrict application of the economic loss doctrine to the plaintiffs' professional negligence claim.  Because the plaintiffs have alleged only economic losses arising out of its agreement with Allstate and have not alleged any physical injury or property damage, the plaintiffs' claim of professional negligence is barred by the economic loss doctrine.

Moreover, because there is no evidence in the record that the defendant is in the business of supplying information for use by third parties, Bilt-Rite would not apply to the plaintiffs' negligent misrepresentation claim, which would also

be barred by the economic loss doctrine.

In addition to the economic loss doctrine, the defendant argues that the plaintiffs' claims are barred under the gist of the action doctrine. Under the gist of the action doctrine, Pennsylvania intermediate courts have held that plaintiffs may not recast ordinary breach of contract claims into tort claims. Bash v. Bell Tel. Co. of Pennsylvania, 601 A.2d 825, 829 (Pa.Super. 1992). The gist of the action doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract. Hart v. Arnold, 884 A.2d 316, 340 (Pa.Super. 2005). "The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." Redevelopment Auth. of Cambria County v. Int'l Ins. Co., 685 A.2d 581, 590 (Pa.Super. 1996). Therefore, the gist of the action is contractual if "the parties' obligations are defined by the terms of contracts, and not by the larger social policies embodied by the law of torts." Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir.2001).

In this case, the plaintiffs have failed to establish a breach of any duty imposed by social policy as opposed to mutual consensus. Their claims, in fact, derive from the contract entered into with Allstate to repair the septic system on the Liberty Annex property. Therefore, the plaintiffs' claims are also barred by the gist of the action doctrine.

## IV.   CONCLUSION

Based upon the foregoing, the court is compelled to find that the plaintiffs' claims for professional negligence and negligent misrepresentation are barred by the economic loss doctrine and the gist of the action doctrine.  As such, the defendant's motion for summary judgment will be granted on these bases[12].  An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** August 3, 2007
O:\shared\MEMORANDUMS\2006 MEMORANDUMS\06-0541.02.wpd

---

[12]The court notes that the defendants have set forth additional arguments in support of their motion for summary judgment.  However, because the court finds the economic loss doctrine and the gist of the action doctrine arguments to be dispositive, the defendant's alternative arguments will not be addressed herein.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CAROL HULTS and** <br> **JENNY REDONDO,** | : |
| | : |
| **Plaintiffs** | :    **CIVIL ACTION NO. 4:06-0541** |
| **v.** | :      **(MANNION, J.)** |
| **ALLSTATE SEPTIC SYSTEMS,** <br> **LLP,** | : |
| **Defendant** | : |

**O R D E R**

Based upon the memorandum issued by the court this same day, **IT IS HEREBY ORDERED THAT:**

**(1)**     the defendant's motion for summary judgment, **(Doc. No. 29)**, is **GRANTED** to the extent that the plaintiffs' claims for professional negligence and negligent misrepresentation are barred by the economic loss doctrine and the gist of the action doctrine

**(2)**     the final pre-trial conference scheduled for August 7, 2007, and the trial scheduled for August 20, 2007, are **CANCELLED**; and

**(3)**     the Clerk of Court is hereby directed to close this matter.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** August 3, 2007
O:\shared\MEMORANDUMS\2006 MEMORANDUMS\06-0541.02.wpd